# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 23-0286V**

| | |
|---|---|
| SRILATHA RACHAN,<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Chief Special Master Corcoran<br><br>Filed: August 24, 2026 |

*Amy A. Senerth, Muller Brazil, LLP, Dresher, PA, for Petitioner.*

*Sara DeStefano, U.S. Department of Justice, Washington, DC, for Respondent.*

## RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On February 27, 2023, Srilatha Rachan filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") resulting from an influenza ("flu") vaccine received on September 15, 2021. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

The parties were unable to settle the claim, and have now briefed entitlement and damages (ECF Nos. 37, 40, 43, 44). For the reasons set forth below, I find that Petitioner's shoulder pain likely began within 48 hours of vaccination, and that she is otherwise entitled to compensation. For damages, I award **$75,000.00** for actual pain and suffering, plus **$873.97** for past unreimbursable expenses.

## I. Factual Evidence

### A. Medical Records

Petitioner received a flu vaccine in her left deltoid on September 15, 2021. Ex. 1 at 1; Ex. 12 at 3. Nearly four months later (January 10, 2022), she consulted an orthopedist for treatment of left shoulder pain, explaining that she "received a vaccination and *since that time*, she has had progressively worsening pain" – suggesting that her pain began soon after vaccination. Ex. 2 at 18 (emphasis added). However, the record of this visit also states that Petitioner "denies any problems before *October*" – potentially allowing for the conclusion that the onset of her pain began more than two weeks after vaccination. *Id*. (emphasis added). On examination, her left shoulder exhibited reduced range of motion ("ROM") compared to her right shoulder. *Id*. at 18-20. Petitioner was assessed with left shoulder pain and adhesive capsulitis. *Id*. at 20. She declined a steroid injection, and a stretching program was recommended. *Id*.

On the same day (January 10, 2022), Petitioner underwent a physical therapy ("PT") evaluation. Ex. 3 at 4. She reported that she "[s]tarted to have discomfort in (L) shoulder/arm following flu vaccination September 15, 2021." *Id*. The therapist documented the mechanism of injury as "pain after flu vaccination," and noted a "~4 month history of (L) shoulder pain and limited ROM causing functional deficits." *Id*. Petitioner rated her pain five out of ten, ranging from four at best to eight at worst. *Id*. She was given instructions in shoulder exercises and discharged with instructions to continue the exercises at home. *Id*. at 6.

On February 15, 2022, Petitioner saw a new primary care physician ("PCP") to establish care. Ex. 4 at 15. She reported "pain in left arm after flu vaccine 5 days after had PT and still no relief" – an ambiguous phrase that could suggest that she reported her pain as beginning *five* days after vaccination. *Id*. The record of this visit further explains that she was there "because she has had pain on her left arm after her Flu shot last September." *Id*. Petitioner was assessed with bursitis of the left deltoid and referred to PT. *Id*. at 20.

Petitioner underwent a PT evaluation the following day. Ex. 15 at 2. She reported "ongoing L shoulder pain that began in 9/2021." *Id*. Her pain had worsened and now ranged from seven to ten out of ten, and her left shoulder exhibited decreased ROM in all planes. *Id*. She attended a total of six PT sessions between February 16 and March 10,

2022. *Id*. at 2-27. She was formally discharged on April 12, 2022, with the therapist noting that she was not responding to PT as expected and planned to discuss other options with her physician. *Id*. at 27.

On March 21, 2022, Petitioner returned to her PCP for a scheduled follow up appointment to treat "[l]eft arm pain after flu vaccine." Ex. 4 at 48. She continued to experience pain and "very limited ROM." *Id*. at 49. An MRI was ordered, and she was given steroid medication and referred to an orthopedist. *Id*. at 52.

Two months later (May 20, 2022), Petitioner consulted an orthopedist concerning her left shoulder pain. Ex. 2 at 17. She rated her pain five out of ten. *Id*. She had done home exercises, PT, and taken oral steroids, all without significant benefit. *Id*. She was assessed with "[l]eft shoulder vaccination induced frozen shoulder," and referred for an MRI. *Id*. at 16-17. The MRI showed rotator cuff tendinosis with mild insertional tearing of the infraspinatus tendon, subacromial subdeltoid bursitis, and nonspecific subcutaneous edema in the left axilla. Ex. 7 at 5-6.

Petitioner returned to the orthopedist to review the MRI on June 24, 2022. Ex. 2 at 11. She now rated her pain eight out of ten and stated that she continued to experience painful loss of motion in her left shoulder. *Id*. On examination, she exhibited "significant motion loss about her left shoulder." *Id*. Petitioner was given an ultrasound-guided steroid injection. *Id*. at 9.

Petitioner saw her PCP on July 21, 2022, to follow up on chronic conditions and shoulder pain. Ex. 4 at 85-86. She reported that she had received a steroid injection about three weeks prior, followed by a 30% improvement, but remained unable to sleep due to pain. *Id*. Her PCP recommended that she follow up with the orthopedist for a possible second injection. *Id*.

On September 16, 2022, Petitioner saw her orthopedist for treatment of her left shoulder pain, which she now rated six out of ten. Ex. 2 at 5. She had experienced global pain previously, but it was now isolated to the posterior aspect of her shoulder. *Id*. She continued to do home exercises, and had noticed improvement in her ROM. *Id*. Her orthopedist thought she was "much improved" since her last visit, though her left shoulder pain and loss of motion persisted. *Id*. A second steroid injection was administered. *Id*. at 4. Petitioner was instructed to return for a surgical consultation if she was not happy with the function of her shoulder over the following six weeks. *Id*.

Seven months later (April 24, 2023), Petitioner returned to her orthopedist. Ex. 11 at 10. Her shoulder was "markedly improved" since her last visit, but she was concerned that she continued to experience pain in her lateral upper arm. *Id*. On examination, her ROM was full and symmetric, with no pain at extremes. *Id*. A repeat MRI was recommended. *Id*.

### B. Testimonial Evidence

Petitioner filed a declaration in support of her claim. Ex. 10. She states that on September 17, 2021 (two days post-vaccination), she "started to feel pain, and soreness in my left shoulder." *Id*. at ¶ 4. She self-treated with over-the-counter medications, exercises, and immobilizing her shoulder. *Id*. When her pain did not improve and her shoulder ROM worsened, she called an orthopedist in December to schedule an appointment, but could not be seen until January. *Id*.

Petitioner notes that she receives the flu vaccine annually. Ex. 10 at ¶ 5. Normally her shoulder is sore for about 24-48 hours, and the soreness never persists beyond two to three days. *Id*. With the at-issue vaccination, however, she felt "a different type of pain." *Id*. She felt as though her shoulder joint was affected, and she was unable to raise her arm or stretch it outwards. *Id*.

Suresh Kurnootala, Petitioner's cousin, who speaks with Petitioner daily by phone, submitted a declaration on her behalf. Ex. 13 at ¶ 2. On the day Petitioner received the vaccine, she complained of "a little bit of discomfort on her left shoulder." *Id*. at ¶ 4. A couple of days later, she stated that her left shoulder pain had worsened and she was having difficulty getting dressed and reaching into a cupboard. *Id*. at ¶ 5.

Rahul Rachan, Petitioner's adult son, submitted a declaration on her behalf. Ex. 14. He was in college at the time, but was home with his mother for the first few days after her vaccination. *Id*. at ¶¶ 3, 4. One day after vaccination, while preparing dinner, she complained to him about severe pain in her shoulder. *Id*. at ¶ 5. She could not prepare meals without great difficulty. *Id*. Over the following days, Petitioner continued to complain about shoulder pain. *Id*.

A month after vaccination, in mid-October, Petitioner called her son and described shoulder discomfort severe enough that she was considering going to the emergency room. Ex. 14 at ¶ 6. When he went home, he realized her condition was worse than he expected: she was wearing a brace on her arm and a sling on her shoulder, and told him that the pain she first experienced after vaccination never went away. *Id*. He took some time off school and stayed at home to help with household chores because she was in "excruciating pain and discomfort." *Id*. Petitioner usually puts out decorations for Halloween, but that year her son assisted because she could not raise her arm above her shoulder. *Id*. at ¶ 7.

## II. Factual Findings and Ruling on Entitlement

### A. Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must preponderantly demonstrate all matters required under Section 11(c)(1), including the

factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received and the lack of other award or settlement,[3] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine Act further includes a "severity requirement," pursuant to which a petitioner demonstrate that they "suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine . . . ." Section 11(c)(1)(D).

"[T]he fact that a Petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4

[3] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

(Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . . does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs*., No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where Petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where Petitioner sought care for four months, followed by fifteen-month gap); *Silvestri v. Sec'y of Health & Human Servs*., No. 19-1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where Petitioner did not seek additional treatment after the five-month mark).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying "Qualifications and Aids to Interpretation" ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g*. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

### B. Parties' Arguments on Entitlement

Petitioner argues that the record preponderantly supports a finding that the onset of her shoulder pain occurred within 48 hours of vaccination. Motion for Ruling on the Record, filed April 1, 2025, at *9-12 (ECF No. 37) ("Mot."). Although Petitioner did not seek treatment for over three months after vaccination, she argues that her treatment delay "at most . . . speaks to the extent of her suffering – her injury was initially manageable, and she attempted to treat her symptoms with home remedies, over-the-counter medications, and activity modification." Mot. at *9-10. The symptom progression described in the testimonial evidence – worsening pain beginning the day after vaccination, increasing difficulty performing daily tasks, ultimately leading her to immobilize her shoulder and seek care when conservative measures failed – "is entirely consistent with adhesive capsulitis and supports, rather than undermines, her reported onset." *Id*. at *10.

Petitioner maintains that the January 2022 orthopedist record stating that she denied any problems before October is "most likely in error." Mot. at *10. Petitioner emphasizes that this statement conflicts with records from the *same* day that clearly link the onset of her pain to her September 15, 2021 vaccination, citing the PT evaluation stating that her symptoms began "following flu vaccination September 15, 2021." *Id*. at *10-11 (citing Ex. 3 at 4). And the February 2022 PCP record stating that she reported "pain in left arm after flu vaccine 5 days after had PT and still no relief" is "grammatically unclear and ambiguous." *Id*. (citing Ex. 4 at 15). She adds that her treating physicians "clearly accepted this temporal relationship," diagnosing her with "vaccination induced frozen shoulder." *Id*. at *11 (citing Ex. 2 at 16-17).

Respondent asserts that Petitioner has failed to establish by preponderant evidence that she experienced pain within 48 hours of vaccination, and thus cannot establish a Table SIRVA claim. Response, filed June 20, 2025, at *6-8 (ECF No. 43) ("Resp."). Petitioner did not seek treatment for shoulder pain until nearly four months after vaccination. Resp. at *6. And when she did seek care, she "did not assert that her pain began within forty-eight hours of her September 15, 2021 flu vaccination." *Id*. Furthermore, the record of her first treatment visit states that she denied any problems before *October* 2021 – which would place onset at least two *weeks* after vaccination. *Id*. (citing Ex. 2 at 18). And in February 2022, her PCP noted that she complained of "pain in left arm after flu vaccine 5 days after had PT and still no relief." *Id*. (citing Ex. 4 at 9).

Respondent further argues that these statements to health care providers, coupled with Petitioner's delay in seeking care, support a finding that Petitioner's shoulder pain more likely than not began several days to weeks after vaccination – not within 48 hours. Resp. at *6. Even if I were to accept Petitioner's suggestion that the above statements in her medical records should be ignored, the medical records "still do not establish that petitioner's pain began within forty-eight hours." *Id*. at *7. Respondent notes that other records document that Petitioner reported pain beginning "after" vaccination, "since" vaccination, or "~4 months," and asserts that these "vague statements" fail to establish the onset of pain within 48 hours. *Id*. And Respondent asserts that Petitioner's testimonial evidence, created in the context of litigation, should be afforded minimal weight. *Id*.

In reply, Petitioner emphasizes that the January 2022 record stating that Petitioner denied any problems before October also states that she "received a vaccination and *since that time*, she has had progressively worsening pain." Reply, filed July 8, 2025, at 2 (ECF No. 44) ("Reply") (citing Ex. 2 at 18) (emphasis added). And the "isolated notations" Respondent relies upon "do not undermine the record as a whole which documents clear and consistent reports that Petitioner's pain began after vaccination." Reply at *2.

### C. Factual Findings Concerning Onset

The record supports a finding that Petitioner's shoulder pain likely began within 48 hours of vaccination. Although Petitioner delayed somewhat in seeking medical treatment, this is not uncommon in SIRVA cases, and therefore does not raise fact issues weighing against success in establishing onset. *Tully v. Sec'y of Health & Human Servs*., No. 21-1998V, 2024 WL 4533515 (Fed. Cl. Spec. Mstr. Sept. 20, 2024) (finding onset occurred within 48 hours although claimant did not seek care for two and a half months); *Diaz v. Sec'y of Health & Human Servs.*, 20-1003V, 2023 WL 8440873, at *6 (Fed. Cl. Spec. Mstr. Nov. 1, 2023) (finding onset was within 48 hours where the petitioner delayed seeking care for over three months after vaccination); *Buck v. Sec'y of Health & Human Servs*., No. 19-1301V, 2023 WL 6213423, at *7 (Fed. Cl. Spec. Mstr. Aug. 23, 2023) (finding onset of pain occurred within 48 hours where the petitioner did not seek care for

over three months and noting that a delay in seeking care is relevant to onset, but not dispositive).

Petitioner first received treatment for her shoulder pain less than four months after vaccination, reporting shoulder pain *since* vaccination. Ex. 2 at 18. I acknowledge that the same record states that she denied problems before October (and thus outside the Table's two-day onset period). However, this record overall supports the conclusion that Petitioner consistently related her pain to vaccination, and described it as occurring soon after vaccination – not just at some later point in time.

Petitioner also told her physical therapist that her pain began after vaccination – specifically "in 9/2021." Ex. 3 at 4; Ex. 15 at 2. And testimonial evidence supports the medical records. The PCP record stating Petitioner was seen for "pain in left arm after flu vaccine 5 days after had PT and still no relief" – is admittedly ambiguous, but leaves open the possibility that Petitioner reported that her pain began five days after vaccination *or* that her PCP's intended words were not accurately recorded. Ex. 4 at 15.

Respondent argues that when Petitioner sought care, she did not assert that her pain began within 48 hours. But the Vaccine Act does not require that a petitioner specify the timing of onset to health care providers. Instead, a petitioner must preponderantly establish that onset *occurred* within the time set forth in the Table – a standard Petitioner has satisfied.

### D. Factual Findings on Remaining SIRVA QAI Criteria and Statutory Requirements

The remaining QAI and statutory requirements are not disputed, and I find that they are satisfied. The record does not contain preponderant evidence that Petitioner had a history of shoulder pain or another condition that would explain her post-vaccination symptoms. Ex. 8. She exhibited reduced ROM, and her symptoms were limited to the shoulder in which the vaccine was administered. Ex. 2 at 18-20; Ex. 3 at 4. She received a covered vaccine in the United States. Ex. 1 at 1; Ex. 12 at 3. She experienced residual effects of her condition for more than six months. Ex. 4 at 48. And she states that she has never received an award or settlement for her vaccine injuries, nor has she filed a civil action. Ex. 10 at ¶ 8.

Petitioner has established by preponderant evidence that all Table SIRVA and QAI requirements are established. Further, she has established all statutory requirements for entitlement. Thus, Petitioner is entitled to compensation.

## III. Damages

### A. Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Section II of *Pello v. Sec'y of Health & Human Servs*., No. 24-1896V, 2026 WL 2211341 (Fed. Cl. Spec. Mstr. July 14, 2026).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[4]

### B. Parties' Damages Arguments

Petitioner proposes a pain and suffering award of $90,000.00, citing *Kent* and *Bruegging*, in which the claimants were awarded $80,000.00 and $90,000.00, respectively.[5] Mot. at *16-17. Petitioner asserts that her injury was severe and persistent, marked by high pain levels, limited ROM, and functional limitations resulting in two steroid injections and consideration of surgery. *Id*. at *13. At her January 2022 PT evaluation, she exhibited markedly limited ROM and rated her pain five out of ten (ranging from four to eight), reporting difficulty sleeping, lifting, and with self-care. *Id*. at *14. Her first steroid injection resulted in only 30% improvement. *Id*. Although she somewhat delayed seeking care, once she began treatment she engaged in consistent, ongoing management over the span of at least nine months, and returned to her orthopedist over a year and a half after vaccination reporting continued pain. *Id*. at *14-15.

Respondent suggests a pain and suffering award of no more than $35,000.00 is appropriate, citing *Valdez*, *McGraw*, and *Turnquest*, in which the petitioners were awarded $35,000.00, $37,500.00, and $30,000.00, respectively.[6] Resp. at *8-11.

---

[4] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

[5] *Kent v. Sec'y of Health & Human Servs.*, No. 17-0073V, 2019 WL 5579493 (Fed. Cl. Spec. Mstr. Sept. 30, 2019), and *Bruegging v. Sec'y of Health & Human Servs.*, No. 17-0261V, 2019 WL 2620957 (Fed. Cl. Spec. Mstr. May 13, 2019).

[6] *Valdez v. Sec'y of Health & Human Servs.*, No. 21-394V, 2024 WL 1526536 (Fed. Cl. Spec. Mstr. Feb. 28, 2024); *McGraw v. Sec'y of Health & Human Servs.*, No. 21-72V, 2024 WL 1160065 (Fed. Cl. Spec.

Respondent asserts that Petitioner suffered a mild injury, with limited conservative treatment. *Id*. at *9-10. Her treatment included prescription medication, two steroid injections, and PT. *Id*. at *10. She did not seek care until nearly four months after vaccination, treated for approximately eight months, then returned for one appointment after a seven-month gap. *Id*. at *10-11. Respondent characterizes Petitioner's treatment as less rigorous than the petitioner in *McGraw*, but more rigorous than the petitioner in *Turnquest*. *Id*.

In reply, Petitioner asserts that her injury, limitations, and treatment course are more severe than the cases Respondent cites. Reply at *4-6. Petitioner cites additional cases in support of her proposed award: *Smallwood*, *Celuch*, and *Gentile*, with awards of $72,500.00, $70,000.00, and $85,000.00, respectively.[7] *Id*. at 6-8.

**C. Appropriate Compensation for Pain and Suffering**

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

Petitioner suffered a moderate SIRVA that persisted for over a year, which she treated conservatively with two cortisone injections, seven PT sessions, oral steroid medication, and home exercises. Although she initially did not seek treatment for several months, thereafter she persistently treated her injury. She consistently reported moderate to high pain levels, and her orthopedist noted that she exhibited significant ROM limitations. She treated her injury until a year after it began, at which time her pain was more isolated – but still significant at six out of ten – and her ROM had improved. After a second steroid injection, she did not seek care again for seven months, suggesting that the injection provided significant relief. When she returned to her orthopedist after a seven-month gap, she exhibited full ROM, but reported lingering pain.

The cases Respondent cites involve petitioners with milder injuries that resolved much sooner than Petitioner's. Of the cases Petitioner cites, *Celuch* provides the best comparison. Neither Petitioner nor the *Celuch* claimant sought care soon after vaccination, with Petitioner's treatment delay lasting about twice as long. Petitioner reported higher pain levels and underwent one more steroid injection, but attended less PT, compared to the *Celuch* petitioner. Significantly, Petitioner's injury persisted for longer

---

Mstr. Feb. 15, 2024); and *Turnquest v. Sec'y of Health & Human Servs.*, No. 21-0065V, 2024 WL 3665961 (Fed. Cl. Spec. Mstr. July 2, 2024).

[7] *Smallwood v. Sec'y of Health & Human Servs.*, No. 18-0291V, 2020 WL 2954958 (Fed. Cl. Spec. Mstr. Apr. 29, 2020); *Celuch v. Sec'y of Health & Human Servs.*, No. 18-544V, 2021 WL 2368137 (Fed. Cl. Spec. Mstr. May 10, 2021); and *Gentile v. Sec'y of Health & Human Servs.*, No. 16-980V, 2020 WL 3618909 (Fed. Cl. Spec. Mstr. June 5, 2020).

than the *Celuch* petitioner, and she continued to experience more significant symptoms at the time she stopped seeking care a year after her injury. Overall, Petitioner experienced a more severe injury, that persisted for longer, compared to the *Celuch* petitioner.

*Kent* and *Bruegging* also bear some similarities. However, these decisions were issued over seven years ago at a time when there were few reasoned SIRVA damages decisions.[8] At the present time, when hundreds of such decisions have been issued,[9] there are undoubtedly more recent decisions that would be better comparables. Taking these factors into account, I find that $75,000.00 is an appropriate pain and suffering award in this case.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I GRANT Petitioner's motion for a ruling on the record, and find that Petitioner suffered an injury that meets the definition for a Table SIRVA and is entitled to compensation. I find that $75,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering**.[10] Additionally, I find that Petitioner is entitled to **$873.97 in unreimbursable expenses**.[11]

Based on consideration of the record as a whole and arguments of the parties, **I award Petitioner a lump sum of $75,873.97, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of Court is directed to enter judgment in accordance with this Decision.[12]

**IT IS SO ORDERED.**

[8] The *Kent* decision states that as of late May 2019, then-Chief Special Master Dorsey had issued 19 reasoned decisions in SIRVA cases. *Kent*, 2019 WL 5579493, at *9.

[9] The recent *Pello* decision states that 392 reasoned SIRVA damages decisions or rulings had been issued as of July 1, 2026. *Pello*, 2026 WL 2211341, at *2.

[10] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[11] The parties agree that this sum is reimbursable. Resp. at *8; Reply at *9.

[12] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master